UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SPIEL ASSOCIATES, INC.,

                             **Plaintiff,**

          **-against-**

GATEWAY BOOKBINDING SYSTEMS, LTD.,

                            **Defendant.**
-------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

**03-CV-4696 (FB)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

       Plaintiff Spiel Associates, Inc. ("Spiel" or "plaintiff") brought this action against

defendant Gateway Bookbinding Systems, Ltd. ("Gateway" or "defendant"), seeking damages

resulting from Gateway's alleged infringement of patents held by Spiel.  The parties mutually

applied for a hearing pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed.

Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996), to construe the contested terms of art within

Spiel's patent claims.  After the Honorable Frederic Block referred the matter to the

undersigned magistrate judge for a *Markman* hearing and preparation of a report and

recommendation, the parties consented to the appointment of a special master pursuant to Rule

53 of the Federal Rules of Civil Procedure.  Currently pending before this Court are Spiel's

objections to portions of the report prepared by Special Master Lawrence B. Goodwin (the

"Special Master" or "Goodwin") construing the contested claim terms.[1]  For the reasons set

---

[1]  The Report of Lawrence B. Goodwin, Pursuant to Fed. R. Civ. P. 53, Regarding
Construction of U.S. Patents 6,547,502 and 6,726,426 (the "Report") has been docketed as
Document #83-1 in the Electronic Case Filing ("ECF") court file.  For ease of reference, most
of the citations in this opinion will include (in brackets) the corresponding ECF document
number.

forth below, this Court recommends that the Special Master's Report be adopted in its entirety.

## BACKGROUND

Spiel manufactures, distributes and sells bookbinding machinery that uses plastic spiral coils for binding books. Plaintiff's Amended Verified Complaint ("Am. Compl.") [#32] ¶ 1. The bookbinding industry traditionally has used two separate machines for creating spiral-bound books, one that forms plastic spiral coils (a "forming machine"), and another that inserts the coils through paper with previously punched holes (a "binding machine"). See id. ¶ 2; see also Affidavit [of Saul Spiel] in Support [of Verified Complaint] ("Saul Spiel Aff.") [#1] ¶ 3.[2] Recognizing certain inefficiencies in this system, Spiel developed a methodology to form the coils and bind the paper in a continuous automated process, or "inline system," by linking the two machines with a conveyor. Am. Compl. [#32] ¶¶ 4-5; Saul Spiel Aff. [#1] ¶¶ 5-6. Spiel applied for and received two patents for its "Combination Plastic Spiral Forming Machine And Semi-Automatic Plastic Spiral Binding Machine" (collectively, "the Patents"). See Am. Compl. [#32] ¶¶ 7, 12; U.S. Patent No. 6,547,502 (filed Oct. 2, 2000) (the "'502 Patent"); U.S. Patent No. 6,726,426 (filed Aug. 10, 2002) (the "'426 Patent").[3]

---

[2] The Saul Spiel Affidavit is appended to plaintiff's original pleading, the Verified Complaint [#1].

[3] According to Spiel, the '426 Patent is "an incremental improvement over" the earlier Patent. See Plaintiff's Initial Markman Brief on Claim Construction ("Pl. Markman Br.") [#68] at 3. Because the '426 Patent is a continuation of the '502 Patent, see Am. Compl. [#32] ¶ 12, and contains many of the same claims and specifications, all citations hereinafter to the former will also apply to the latter, unless specifically indicated otherwise.

The Patents are reproduced as Exhibits A and B to plaintiff's initial *Markman* brief [#68], and as Exhibits A and B to the Declaration of Michael S. Neustel in Support of Gateway's

(continued…)

Spiel's system, which it markets under the name "Coilmaster II," allegedly avoids the problems associated with prior integrated systems, which, Spiel contends, result in brittle plastic coils as a result of their use of rapid cooling. See Report [#83-1] at 7; Saul Spiel Aff. [#1] ¶¶ 6, 12. In Spiel's system, the coils are formed and cut to length by the coil forming machine, then fall onto a linkage conveyor that allows the coils to cool slowly under "ambient air" as they are conveyed to the binding machine. Report [#83-1] at 7-8. The cooled coils are then used to bind books in the binding machine. Id. at 6. Spiel alleges that it first displayed an early model of the inline system at a trade show in Chicago in October 1999, and later exhibited the Coilmaster II system at a trade show in Miami in January 2000. See Saul Spiel Aff. [#1] ¶¶ 10, 13.

Gateway manufactures and sells plastic coil formers, plastic coil binding machines, plastic filament and plastic coil. See Gateway's Memorandum Regarding Claim Construction of U.S. Patent Nos. 6,547,502 and 6,726,426 ("Gateway Claim Mem.") [#66], at 1 & n.3 (citing Plastikoil, http://www.plastikoil.com (last visited June 18, 2007)); Gateway's Second Amended Answer, Affirmative Defenses & Counterclaims to Spiel's Amended Complaint ("2d

---

[3](...continued)
Memorandum Regarding Claim Construction of U.S. Patent Nos. 6,547,502 and 6,726,426 [#67]. Hereinafter, exhibits appended to the Neustel Declaration will be cited as "Def. Ex. _____," exhibits appended to Spiel's initial *Markman* brief [#68] will be cited as "Pl. Ex. _____," exhibits appended to Gateway's Responsive Memorandum Regarding Claim Construction of U.S. Patent Nos. 6,547,502 and 6,726,426 ("Gateway Resp. Claim Mem.") [#70] will be cited as "Def. Resp. Ex. _____," and exhibits appended to Plaintiff's Brief in Objection to Portions of the Special Master's Report on *Markman* Patent Claim Construction ("Pl. Obj.") [#85] will be cited as "Pl. Obj. Ex. _____." References to page numbers of exhibits appended to the parties' papers are to exhibit pagination, and not to the pagination of the documents contained therein.

Am. Ans.") [#49] ¶ 191.  Saul Spiel, one of plaintiff's officers, alleges that while attending a

trade show in September 2001, Spiel representatives noticed that Gateway was promoting an

inline system called "PLASTIKOIL Concept III Interline System," which appeared to function

in a manner similar to Spiel's system.  Saul Spiel Aff. [#1] ¶¶ 19-20; see Am. Compl. [#32]

¶¶ 22-24.  Gateway claims that its system, in contrast to Spiel's, uses rapid cooling by blowing

"non-ambient" air on the hot coil prior to cutting.  See Gateway Claim Mem. [#66] at 2.  The

coils are then dispensed onto an inclined "accumlulator tray" to store the coils prior to

insertion by the binding machine.  Id.

        Spiel commenced the instant action on September 16, 2003, alleging that, *inter alia*,

Gateway's product infringed on its Patents.  See Am. Compl. [#32] ¶¶ 49-58.  Gateway

interposed a series of counterclaims, asserting patent invalidity and non-infringement, false

advertising, trade libel, and antitrust violations.  See 2d Am. Ans. [#49] ¶¶ 98-201.  On

December 31, 2004, both parties requested that the Court conduct a *Markman* hearing to

construe the terms of the Patents.  See 12/31/04 Letter from Michael S. Neustel to Judge Block

[#56].  Following two rounds of briefing by both sides,[4] Judge Block referred the *Markman*

proceeding to the undersigned magistrate judge.  See 3/29/06 Order [#77].  Thereafter, the

parties consented to having the hearing presided over by a special master pursuant to Rule 53 of

the Federal Rules of Civil Procedure.  See 5/10/06 Minute Entry for Proceedings Before

Magistrate Judge Mann [#79].  At the suggestion of the parties, the Court designated patent

attorney Lawrence Goodwin to conduct a *Markman* proceeding and submit a report and

---

[4]  See Pl. Markman Br. [#68]; Gateway Claim Mem. [#66]; Plaintiff's Rebuttal Markman
Brief on Claim Construction ("Pl. Rebuttal") [#69]; Gateway Resp. Claim Mem. [#70].

recommendation regarding the claim construction issues raised by the parties.  See 7/5/06 Order
[#82].[5]

The Special Master held a *Markman* hearing on September 19, 2006, and addressed each
of the parties' twenty disputed claims.  See Transcript of Markman Hearing dated September
19, 2006 ("Tr.") [#83-2].[6]  On November 20, 2006, the Special Master filed his Report
construing the disputed claim terms.  Spiel thereafter objected to the Report with respect to the
construction of four of the disputed terms: (1) "conveyor;" (2) "hot binding coils;" (3) "first
higher temperature;"[7] and (4) "ambient air."  See Pl. Obj. [#85] at 1.[8]  Gateway did not object

_____

[5] Special Master Goodwin was one of three candidates recommended by the parties and chosen
by the Court after reviewing the backgrounds of each of the proffered candidates.  Goodwin is
a partner at the law firm of Kasowitz, Benson, Torres & Friedman LLP.  He graduated from
American University Washington College of Law in 1979, after receiving his Bachelor of
Science in Electrical Engineering from the University of Maryland in 1975.  He worked as a
Patent Examiner with the United States Patent and Trademark Office from 1976 to 1979.  See
Kasowitz, Benson, Torres & Friedman LLP, http://www.kasowitz.com/attorney/
detail.aspx?id=b1cd515e-cf55-41e3-8320-009857057065&fromsearch=yes (last visited June
19, 2007); Martindale.com, http://www.martindale.com/xp/Martindale/Lawyer_Locator/
Search_Lawyer_Locator/search_detail.xml?STS=&LNAME=goodwin&CN=&PG=1&bc=6
5&CRY=&ratind=&FN=&FNAME=lawrence&STYPE=N&a=79ADE51F568FC5&l=01
356DA2D3053B&type=2&pos=3&cnt=3 (last visited June 19, 2007).

[6] The hearing consisted of oral argument; no witnesses were presented.

[7] Spiel conflated its objections to "hot binding coils" and "first higher temperature" into one
section in its brief.  See Pl. Obj. [#85] at 7.  For the sake of clarity, and because the Special
Master's Report addressed the terms in different sections, this Report and Recommendation
will discuss these terms separately.

[8] As no objection was filed to any of the constructions of the other sixteen terms addressed in
the Report, this Court need not review them under the same stringent standard (i.e., *de novo*
review) as the terms to which Spiel objects.  See Fed. R. Civ. P. 53(g)(3) advisory
committee's notes; see generally Alpex Computer Corp. v. Nintendo Co., No. 86-CV-1749
(KMW), 1994 WL 330381, at *4-5 (S.D.N.Y. July 11, 1994).  However, even applying *de
novo* review, the Court finds no fault with the Special Master's construction of these terms,

(continued...)

to any of the Special Master's recommendations and instead urged the Court to adopt those

recommendations over Spiel's objections.  <u>See</u> Gateway's Response to Plaintiff's Opposition to

Special Master's Report on *Markman* Patent Claim Construction [#86].

## <u>APPLICABLE LAW</u>

The first step in a patent infringement analysis is to determine the "meaning and scope

of the patent claims asserted to be infringed," otherwise known as "claim construction or

interpretation."  <u>See</u> <u>Markman</u>, 52 F.3d at 976.  The construction of patent terms is a question

of law to be determined by the Court, <u>id.</u> at 979, applying the law of the Federal Circuit to

issues of substantive patent law.  <u>See</u> <u>Astra Aktiebolag v. Andrx Pharms., Inc.</u>, 222 F.Supp.2d

423, 486 (S.D.N.Y. 2002).  In assessing the Report of the Special Master, the Court reviews

*de novo* those portions of the Report objected to by the parties and may, pursuant to Rule 53,

"adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with

instructions."  <u>See</u> Fed. R. Civ. P. 53(g)(1); <u>In re Omeprazole</u>, No. M-21-81 (BSJ), MDL

1291, 2004 WL 1124653, at *1 (S.D.N.Y. May 19, 2004).

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude."  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303,

1312 (Fed. Cir. 2005) (internal quotation marks omitted).  "A court construing a patent claim

seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the

time of the invention."  <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d

1111, 1116 (Fed. Cir. 2004).  Because this inquiry is an objective one, the Court must look to

---

[8](…continued)
many of which the parties acquiesced in at the *Markman* hearing.  <u>See</u> <u>generally</u> Tr. [#83-2].

"those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Id.

    The Federal Circuit has established a hierarchy of sources for courts to consider in construing patent claims. First the Court must examine the intrinsic evidence – which includes the language of the claims,[9] the specification,[10] and the prosecution history[11] – to determine the scope of the patent. See Markman, 52 F.3d at 979. Furthermore, as "the language of the claim defines the scope of the protected invention[,] . . . resort must be had in the first instance to the words of the claim, words to which we ascribe their ordinary meaning unless it appears the inventor used them otherwise." Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 619-20 (Fed. Cir. 1995) (citing Yale Lock Mfg. Co. v. Greenleaf, 117 U.S. 554, 559 (1886), and Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed. Cir. 1984)) (internal quotation marks omitted). Absent "an express intent to impart a novel meaning to the claim terms," terms in a claim "are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art." Mars, Inc. v. H.J. Heinz Co., 377 F.3d 1369, 1373 (Fed. Cir. 2004) (internal quotation marks omitted).

    While the ordinary meaning of the claim language may in certain cases be readily

---

[9] The claims serve to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." See 35 U.S.C. § 112.

[10] "The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[11] "[The prosecution] history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." Vitronics, 90 F.3d at 1582.

understood, "patentees frequently use terms idiosyncratically," and thus "the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent." Phillips, 415 F.3d at 1314. The Court therefore must "review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitronics, 90 F.3d at 1582 ("Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."); see Markman, 52 F.3d at 979 ("For claim construction purposes, the [specification] may act as a sort of dictionary, which explains the invention and may define terms used in the claims."); cf. Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578 (Fed. Cir. 1996) (stating that where the specification does not define a claim term or otherwise suggest that the patentee "sought to assign to claim terms anything but their ordinary and accustomed meanings, those are the meanings we must give them"). Because the specification "must be clear and complete enough to enable those of ordinary skill in the art to make and use" the invention, the specification is always highly relevant to – if not dispositive of – the claim construction analysis. Vitronics, 90 F.3d at 1582 ("[The specification] is the single best guide to the meaning of a disputed term."). "[T]he written description [in the specification] can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1344 (Fed. Cir. 2001). Nevertheless, limitations appearing in the specification do not necessarily limit the claims. See Interactive Gift Express, Inc. v.

Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001).  In other words, "the claims must be read in view of the specification, but limitations from the specification are not to be read into the claims."  Teleflex, Inc v. Ficosa N. Am. Corp., 299 F.3d 1313, 1326 (Fed. Cir. 2002) (internal citations omitted).

The final form of intrinsic evidence consists of the prosecution history, which includes all express representations made by the patentee during the application process regarding the scope of the claims; the prosecution history "is often of critical significance in determining the meaning of the claims."  Vitronics, 90 F.3d at 1582; see also Markman, 52 F.3d at 980 ("[The prosecution history] is of primary significance in understanding the . . . true meaning of language used in the patent claims . . . .").  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Phillips, 415 F.3d at 1317.  Accordingly, any "[a]rguments and amendments made during the prosecution of a patent application . . . must be examined to determine the meaning of terms in the claims."  Southwall Techs. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).  In fact, "even where the claim language is not ambiguous, the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."  Schumer v. Lab. Computer Sys., 308 F.3d 1304, 1313 (Fed. Cir. 2002) (quoting Southwall Techs., 54 F.3d at 1576) (internal quotation marks omitted).

If the intrinsic evidence unambiguously establishes the meaning of a claim, "a court may not rely on extrinsic evidence for purposes of claim construction."  Hockerson-Halberstadt, Inc.

v. Avia Group Int'l, Inc., 222 F.3d 951, 955 (Fed. Cir. 2000); see also Vitronics Corp., 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence."). In contrast, where the intrinsic evidence is not dispositive, a court may, in its discretion, rely on extrinsic evidence – which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises" – to arrive at a "correct conclusion as to the true meaning of the language employed in the patent." Markman, 52 F.3d at 980 (quoting Seymour v. Osborne, 78 U.S. 516, 546 (1870)) (internal quotation marks omitted). Extrinsic evidence may "shed useful light on the relevant art, [in certain circumstances,] but is less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (internal quotation marks omitted); see also Phillips, 415 F.3d at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.").

## DISCUSSION

A.    **"Conveyor"**

The parties proposed two constructions of the term "conveyor." Relying on dictionary definitions, the testimony of the inventor and other experts, and case law, Spiel urged that "conveyer" should be broadly construed as "an item that transports something from Point A to Point B." See Pl. Markman Br. [#68] at 9-11. In contrast, Gateway argued that the term "conveyor" means "a conveying structure having a moving surface for carrying plastic coils in

a relatively slow and controlled manner for slowly cooling the hot binding coils." Gateway Claim Mem. [#66] at 20.

In his Report, the Special Master recommended that the term "conveyer" be construed, "for purposes of the present case, as a device that includes a moving surface for transporting articles, as opposed to a chute or a slide." Report [#83-1] at 17. He based this construction on the specification and prosecution history of each of the Patents, confirmed by "dictionary definitions and case law precedent." Id. Spiel now argues, in its objection, that "conveyor" need not have a moving surface, as persons skilled in the art understand "conveyor" to mean "a device that transports items from one place to another." Pl. Obj. [#85] at 1.[12]

i.      **Review of Intrinsic Evidence**

As used in the claims, the term "conveyor" suggests a mechanical apparatus that actively transports something from one place to another. Claim 1 of the '502 Patent includes reference to "a conveyor for *carrying* . . . binding coils from [the] forming machine to [the] binding machine under ambient air conditions, the length of said conveyor being selected to provide enough slow cooling time to bring the temperature of said binding coils down to close to room temperature and a solid, non-brittle state." '502 Patent col.14 ll.18-23 (emphasis added). The term "conveyor" also appears in claims 2 and 7 of the '426 Patent. See '426 Patent col.14

_____

[12] The forming and binding machines in Gateway's allegedly infringing product are connected by an "accumulator" having an inclined non-moving surface along which the coils move prior to their insertion in the paper in the binding machine. See Pl. Markman Br. [#68] at 11; Gateway Claim Mem. [#66] at 2.

ll.38-39 & col.16 ll.1-4.[13]

Even assuming *arguendo* that "the dispositive claim language on its face is susceptible to two equally plausible meanings," see Athletic Alternatives, 73 F.3d at 1579, the specification supports the Special Master's construction of the term "conveyor," and belies Spiel's expansive reading of this term.  The description of the system in the Patents explains that the cut but "still-hot plastic spiral coils . . . fall into a narrow compartment formed by adjacent vanes *attached to a conveyor belt*."  '426 Patent col.13 ll.6-9 (emphasis added).  Then, the "[c]ooling conveyor *moves intermittently* to index to the next empty compartment every time a segment of coil is cut."  Id. col.13 ll.10-12 (emphasis added).  "As it takes some time *for the cooling conveyor to advance*, a coil in the midsection would be significantly cooler by action of ambient air."  Id. col.13 ll.12-14 (emphasis added).  All of this language describes an apparatus with a moving surface.  See also id. col.2 ll.28-30 ("After the plastic coil is formed, it is cut and advanced upon a *conveyor belt* having a plurality of compartments, each holding formed plastic coils.") (emphasis added).

Furthermore, the specification in each Patent explains that the "linkage cooling conveyor" is comprised of a "[w]ide belt" engaged by a pulley driven by a gearmotor.  See id. col.13 ll.32-34.  The speed of the belt is controlled by a motor controller.  Id. col.13 ll.37-40. The specification additionally provides that the "wide belt" is the preferred method for conveying the plastic coils, although "other configurations for the coil advancing conveyor may

_____

[13]  However, claim 1 of the '426 Patent differs from claim 1 of the earlier Patent in that, among other things, the term "conveyor" has been replaced with "means for carrying," '426 Patent col.14 1.31, the construction of which the parties agreed upon at the *Markman* hearing. See Report [#83-1] at 23-24; Tr. [#83-2] at 23:24-26:7.

be used." Id. col.2 ll.44-49. The use of the passive voice in describing the operation of the "coil advancing conveyor," coupled with the reference to "configurations," further suggests that other such methods would similarly require a moving surface, among other parts. See id. col.2 ll.36-38 ("[T]he coils may be cooled *by being advanced* on the conveyor at a speed sufficient for the temperature of the plastic coil to lower."), col.3 ll.1-2 ("[T]he cooled plastic coil *is advanced* upon the conveyor . . . .") (emphasis added). Finally, the illustration referenced by this description as showing the "essential working parts of [the] linkage cooling conveyor" clearly depicts a moving surface. See id. col.13 ll.29-30; id. fig.23; see also id. col.6 ll.11-12. All of the relevant language in the two Patents' specifications thus confirms that a "conveyor" means an apparatus having a moving surface.

Contrary to Spiel's contentions, see Pl. Obj. [#85] at 3-4, this conclusion does not "read limitations into a claim," but, quite properly, reads the language of the claims in light of the specification. See Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification."); Teleflex, 299 F.3d at 1326. The claims describe a conveyor that actively moves the hot coils, and the specification confirms this reading. Furthermore, as previously noted, the specification explicitly states that "other *configurations* for the coil advancing conveyor may be used." See '426 Patent col.2 ll.44-45 (emphasis added). It is significant that Spiel chose the word "configurations," as opposed to "methods" or "systems," as this formulation suggests that Spiel meant to encompass other versions of the detailed, specific conveyor described therein, and not a conveyor without a moving surface. See generally SciMed Life Sys., 242 F.3d at 1341-42 (citing cases in which

claims were given a narrow construction in light of the written description where the specification indicated that the claimed invention used a specific methodology or device). While the law is clear that the claim language is broader than the particular "embodiment" appearing in the specification, see Electro Med. Sys., S.A. v. Cooper Life Scis., 34 F.3d 1048, 1054 (Fed. Cir. 1994), it does not follow that the claim language in these Patents is sufficiently broad to encompass an apparatus with a non-moving surface, especially when viewed in the light of the language of the specification.

The prosecution history surrounding the '426 and '502 Patents provides additional support for the Special Master's construction of the term "conveyor." The United States Patent and Trademark Office ("USPTO") initially rejected Spiel's application for the '426 Patent, on the ground that granting it would result in double patenting given prior art U.S. Patent No. 4,249,278 (filed Jul. 13, 1979) ("Pfaffle"). See Amendment [to Patent Application #10/215,656, dated November 26, 2003] ("'426 Amendment") [Def. Ex. I] [#67-10], at 12. Specifically, the USPTO had rejected one of Spiel's claims as "being unpatentable over the cited art of Pfaffle [] in view of Primeau '156." See id.[14]

In its Amendment filed in response, Spiel distinguished the prior art from the apparatus described in its claims, and ascribed a narrow meaning to the term "conveyor." Spiel argued that although the USPTO noted that Pfaffle had a conveyor, Pfaffle "actually has a roller driven mandrel, not a conveyor." Id. at 13. That argument by Spiel is inconsistent with the position it

_____

[14] The Primeau patent taught cooling the coil in the forming machine with a fan. U.S. Patent No. 6,190,156 (filed Feb. 20, 2001) ("Primeau") [Def. Ex. L] [#67-13], at fig.1, col.4 ll.31-34, col.7 ll.10-13; see also Report [#83-1] at 14.

takes in this litigation, to wit, that a "conveyor" is any item or apparatus that transfers something from one point to another. See Gateway Resp. Claim Mem. [#70] at 4. The broader definition now advanced by Spiel clearly would encompass the mandrel in Pfaffle, which transports the coil to the binding machine. As the prosecution history shows that Spiel disclaimed an apparatus that, by whatever means, caused the coils to be moved from one location to another, it cannot now seek a construction that would reach all such apparati. See Schumer, 308 F.3d at 1313. The prosecution history thereby supports the Special Master's conclusion that Spiel's current construction of "conveyor" is overly broad. See Report [#83-1] at 18.

Spiel had also amended its '502 Patent application for similar reasons. Spiel's initial claims did not specify how the coils were to be conveyed, instead claiming "a cooler cooling said formed hot binding coils to a solid, non-brittle state." See Application for Combination Plastic Spiral Forming Machine and Semi-Automatic Plastic Spiral Binding Machine dated October 2, 2000 [Def. Resp. Ex. FF] [#70-7], at 35. Following an interview with Spiel's representative and counsel on January 8, 2002, the USPTO examiner concluded that, if amended as proposed by Spiel, the claim "appears to [be] distinguish[ed] over prior art of record [Pfaffle]." See USPTO Interview Summary [Def. Resp. Ex. GG] [#70-8]. Spiel thereafter filed a written amendment, modifying the claim to read "a conveyor for carrying said binding coils [from the first machine to the second]," which language appeared in the Patent as approved. See Amendment [to Patent Application #09/677,489, dated January 31, 2002] [Def. Ex. E] [#67-6] ("'502 Amendment"), at 3. This amendment, proposed to avoid unpatentability under Pfaffle, reveals that Spiel was not claiming any and all transportation apparati, as Spiel

replaced the original, more general claim for "a cooler cooling said formed hot binding coils to a solid, non-brittle state" to the more specific "conveyor for carrying." <u>See</u> Gateway Resp. Claim Mem. [#70] at 6.

Spiel additionally argues, without support, that a chute, which does not have a moving surface, qualifies as a conveyor. <u>See</u> Pl. Obj. [#85] at 4-7. However, the specification expressly mentions a "chute" as an entirely separate part of the inline system without a moving surface. <u>See</u> '426 Patent col.7 ll.21-23 (describing "chute" that feeds spiral wire to mandrel); <u>see also</u> Report [#83-1] at 17; Tr. [#83-2] at 27:4-18 (Special Master explains that the distinction in the Patent between "conveyor" and "chute" supports the conclusion that a conveyor is something that "at least has a moving surface").[15] By implication, Spiel's failure to include the term "chute" in a part of the specification describing the "conveyor" suggests that Spiel intended the latter to mean something other than the former.

Furthermore, the prosecution history similarly supports a distinction between the terms "chute" and "conveyor." In a declaration submitted to the USPTO on May 20, 2003, Spiel

_____

[15] The specification language and diagrams describing the chute originate from an earlier Spiel patent for a binding machine, of which the '502 Patent is a continuation-in-part. <u>See</u> U.S. Patent No. 5,890,862 (filed Apr. 21, 1997) ("'862 Patent"), <u>available</u> <u>at</u> http://patft.uspto.gov/ netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FP TO%2Fsrchnum.htm&r=1&f=G&l=50&s1=5,890,862.PN.&OS=PN/5,890,862&RS=PN/ 5,890,862, fig.1, col.3 ll.52-54. Spiel now argues that "chute," as used in the '862 Patent, describes "the infeed mechanism [for spiral coils] of the separate 'offline' binding machine, because the piece did not transfer articles from one machine to another." Pl. Obj. [#85] at 5. However, the '862 Patent in no way indicates that Spiel used the language "chute," as opposed to "conveyor," for the reason now asserted by Spiel. Indeed, the chute in the '862 Patent, which serves to transport spirals to a mandrel prior to binding, readily falls within the broad construction of the term "conveyor" that Spiel proposes in this litigation. <u>See</u> '862 Patent col.4 ll.2-4.

explained that at the October 1999 Chicago trade show, at which it displayed its first inline system, the forming machine did not have an "exit conveyor." See Declaration [of Saul Spiel to the United States Patent Office, dated August 10, 2002] ("Declaration") [Def. Ex. G] [#67-8], at 3; Saul Spiel Aff. [#1] ¶ 10. Accordingly, "a chute made from paper and cardboard was quickly designed and mounted with tape onto the end of the forming machine." Declaration [Def. Ex. G] [#67-8] at 3. The declaration further explained that the coils were "funneled" (not "conveyed") "onto the in-feed conveyor of the binder." Id.;[16] see also Saul Spiel Aff. [#1] ¶¶ 11-12 (indicating that after the Chicago trade show, PVC Spiral Supply, at the direction of Spiel, completed development of the "conveyor"); Am. Compl. [#32] ¶ 16 (same). As the Special Master reasonably concluded, Spiel thereby distinguished the term "conveyor" from "chute," "the latter of which does not have a moving surface." See Report [#83-1] at 17; see also Tr.[#83-2] at 45:23-46:6.[17]

ii.     Review of Extrinsic Evidence

Spiel relies heavily, if not exclusively, on extrinsic evidence to support its expansive construction of the term "conveyor." However, even if the Court were to look beyond the

---

[16]  The Declaration made no further mention of the binding machine's "in-feed conveyor," and this language appears nowhere in either of the Patents.

[17]  Spiel notes that it filed its patent application just under one year after the Chicago trade show, and thus avoided the operation of the "one year rule" of 35 U.S.C. § 102(b), which bars issuance of a patent where the inventor displayed his or her work more than one year before the filing of the patent application; Spiel contends that the timing of its application for a patent proves that Spiel viewed the "cardboard piece [as] just another type of conveyor." See Pl. Obj. [#85] at 7. However, even if Spiel did hold that view, its subjective beliefs do not determine the meaning of the terms in its Patents. See Markman, 52 F.3d at 985 ("The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history).").

17

intrinsic evidence in this case, the extrinsic evidence in fact provides further support for the conclusion that "conveyor" should be read to require a moving surface.

Citing truncated versions of two Merriam-Webster dictionary definitions, Spiel claims that all major dictionaries define "conveyor" consistent with Spiel's broad interpretation. See Pl. Markman Br. [#68] at 9. The complete definitions suggest otherwise, as both indicate a mechanism that actively moves items. See Merriam-Webster's Collegiate Dictionary 254 (10th ed. 1999) [hereinafter Webster's] (defining "conveyor" as "one that conveys[, as] a mechanical apparatus for moving articles or bulk material from place to place (as by an endless moving belt or chain of receptacles)"); Webster's Revised Unabridged Dictionary 319 (1913 ed.), available at http://machaut.uchicago.edu/?resource=Webster%27s&word=conveyor&use1913=on&use1828= on (last visited June 18, 2007) ("A contrivance for carrying objects from place to place; esp., one for conveying grain, coal, etc. – as a spiral or screw turning in a pipe or trough, *an endless belt with buckets, or a truck running along a rope.*") (emphasis added).[18] Thus, both definitions contemplate a moving surface or some other mechanism that actively – not passively, as with a chute – conveys the item from one point to another.[19]

---

[18] See also Webster's New World Collegiate Dictionary 319 (4th ed. 2000) ("one that conveys; esp. a mechanical contrivance, as a continuous chain or belt . . . for conveying something"); Oxford English Dictionary, available at http://dictionary.oed.com/cgi/entry/ 50049236?single=1&query_type=word&queryword=conveyor&first=1&max_to_show=10 (last visited June 14, 2007) [hereinafter OED] ("A thing that conveys or transmits; [attributively,] an endless belt of rubber, canvas, etc., running over rollers or the like, on which objects or material can be conveyed . . . .").

[19] Furthermore, in construing a patent claim, the Court must determine "what one of ordinary skill in the art *at the time of the invention* would have understood the term to mean," see

(continued...)

As further support for its broad construction, plaintiff cites the decision in <u>Lantech, Inc.</u>
<u>v. Keip Mach. Co.</u>, 32 F.3d 542 (Fed. Cir. 1994), which approved the district court's
conclusion that a conveyor is "an apparatus that transports articles from one place to another."
<u>See</u> Pl. Markman Br. [#68] at 11 (quoting <u>Lantech</u>, 32 F.3d at 547). However, the Federal
Circuit further stated that "[t]he term conveyor, as used in the claims and described in the
specification always refers to an operative device or structure which would ordinarily be
considered a conveyor. A conveyor necessarily includes components such as belts, slider
plates, and drives, in addition to a moving surface." <u>Lantech</u>, 32 F.3d at 547; <u>see</u> <u>also</u> <u>id.</u>
("While a conveyor has a moving surface, a moving surface alone is not a conveyor."). The
<u>Lantech</u> court's construction of "conveyor" is thus closer to – and perhaps even narrower than
– the Special Master's construction in this case, and undermines the expansive reading
proposed by Spiel.

Spiel additionally relies on testimony from four experts, including the inventor and
assignor of the Patents. <u>See</u> Pl. Markman Br. [#68] at 9-10. Notably, Spiel conceded in its
initial *Markman* brief that, after giving the claim terms "their ordinary meaning, . . . the Court
need not resort to 'extrinsic evidence' (expert reports, testimony, etc.) to properly interpret the
claims." <u>Id.</u> at 1. Furthermore, the testimony cited by Spiel on the meaning of "conveyor" is
either speculative, not specific to the bookbinding industry, or both. <u>See</u> <u>Phillips</u>, 415 F.3d at
1318 ("[Although] expert testimony can be useful . . . to establish that a particular term in the

---

[19](…continued)
<u>Markman</u>, 52 F.3d at 986 (emphasis added); hence, a dictionary definition predating the
invention by over seventy-five years (<u>see</u> Pl. Markman Br. [#68] at 9) is of little significance.

patent or the prior art has a particular meaning in the pertinent field[,] . . . conclusory,

unsupported assertions by experts as to the definition of a claim term are not useful to a

court."); see also Markman, 52 F.3d at 985 ("[The subjective intent of the inventor . . . is of

little or no weight").[20]

Accordingly, as none of Spiel's extrinsic evidence supports its proposed construction of

"conveyor," the Special Master correctly concluded that Spiel's interpretation was overly

broad.  See Report [#83-1] at 18.[21]

## B.    "Hot Binding Coils"

Spiel further objects to the Special Master's construction of the term "hot binding

coils."  Spiel argued in its initial *Markman* brief that "hot" describes the temperature of the

coil at the point that it leaves the forming machine and begins to travel on the patented cooling

conveyor.  See Pl. Markman Br. [#68] at 13.  In contrast, asserting that "plastic coil forming

---

[20] In addition, at the *Markman* hearing, Spiel proffered evidence, apparently gathered from various web sites, of "different types of conveyors without moving surfaces, including chute conveyors."  Tr. [#83-2] at 30:10-13; see Pl. Obj. Ex. A [#85-2].  As there was no proof that any of those conveyors were used in the bookbinding industry, the Special Master reasonably concluded that the proffered evidence was "of limited probative value."  Tr. [#83-2] at 36:12-16; Report [#83-1] at 2.  In addition, in its objection to the material as new evidence, Gateway asserted that based on an initial review, those conveyors could not operate in the type of inline system at issue here.  Tr. [#83-2] at 37:10-25.  Spiel ignores these arguments in its objection brief.

[21]  Even if the claims' use of the term "conveyor" is deemed to be ambiguous as to its scope, Spiel's broad interpretation must be rejected.  Because the intrinsic evidence does not establish by a "satisfactory degree of certainty" that the claims encompass non-moving surfaces, the Special Master's narrow interpretation controls.  See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1581 (Fed. Cir. 1996) ("[T]o the extent that the claim is ambiguous, a narrow reading which excludes the ambiguously covered subject matter must be adopted.") (citing Athletic Alternatives, 73 F.3d at 1578-81).

temperatures typically exceed 190°F to make the plastic filament malleable for forming on a forming mandrel," Gateway proposed in its *Markman* brief that "hot binding coils" be construed to mean "previously cut plastic spiral coils having a temperature exceeding 190 ° F." Gateway Claim Mem. [#66] at 20. Spiel responded that Gateway's construction was an "oxymoron" because the plastic at that temperature is still in thread form, rather than in separate cut coils. See Pl. Rebuttal [#69] at 8. Spiel reiterated that, construed in tandem, "first higher temperature" and "hot binding coils" "describe the coils at the beginning of the patented cooling conveyor (when the exterior of the coil is at 104°)." Id. In essence, the parties dispute whether a binding coil is still "hot" if some cooling has occurred (i.e., if a cooling mechanism such as a fan is used) within the forming machine.

Rejecting both sides' proposals, the Special Master construed "hot binding coils" to mean "coils formed in the coil forming machine prior to cooling." Report [#83-1] at 12. He further noted that the only cooling described in the Patents takes place along the conveyor between the two machines. Id.; see also Tr. [#83-2] at 107:23-108:3. In its objection, Spiel contends that extrinsic evidence, which the Special Master declined to consider, supported its contention that all forming machines contain an internal cooling system. Pl. Obj. [#85] at 8.

i.      **Review of Intrinsic Evidence**

The intrinsic evidence supports the Special Master's construction of the term "hot binding coils." The '426 Patent claims "a coil forming machine for heating, forming and cutting discrete segments of hot binding coils at a first higher temperature," without reference to cooling at any point in the formation process. '426 Patent col.14 ll.25-27; see also '502

Patent col.14 ll.14-15 (claiming "a coil forming machine forming hot binding coils at a first higher temperature").  The claim language thereby suggests that the coils are brought to this higher temperature in the forming process and then cooling commences under ambient air along the conveyor.  See '426 Patent col.14 ll.31-33; '502 Patent col.14 ll.18-20.  It follows, then, that the coils are "hot" throughout the forming process, and are not subjected to any cooling apparatus or method.

An examination of the specification buttresses this conclusion.  The specification states that in typical forming machines, the plastic thread is preheated and then wound "on a mandrel where it emerges in free air as a hot spiral coil," whereupon "[t]he hot, but rigid, plastic spiral coil emerges from the cutter."  '426 Patent col.12 ll.63-67 & col.13 ll.1-2.  In contrast to prior systems, wherein the cut coils "would fall into a bin for packaging or storage," in the Spiel system the "*still-hot plastic spiral coils* are cut to the length required for the particular book being bound."  '426 Patent col.13 ll.3-7 (emphasis added).  Spiel contends that its use of the word "still" in the specification indicates that "'hot' describes the coil when it exits the forming machine and enters the cooling conveyor," and that coils may thus still fall within the meaning of "hot" even if some cooling has taken place within the forming machine.  See Pl. Markman Br. [#68] at 14 (emphasis in original).  The Special Master explicitly rejected this argument as "contrary to the specification and prosecution history."  See Report [#83-1] at 15. Indeed, examining the plain language of the specification, the use of the word "still" suggests that after being cut by the guillotine, the coils are at essentially the same temperature as upon

emerging from the mandrel. The Patent's abstract[22] likewise indicates that no cooling takes place until the coils are cut. See '426 Patent abstract ("[A] plastic spiral coil is formed at a first raised temperature, then cut . . . , cooled and then advanced toward [the binding machine].").

Finally, the prosecution history reveals that Spiel explicitly stated that no cooling takes place prior to the cutting of the coils. In the '426 Amendment, which Spiel submitted in response to the USPTO's rejection of one of its claims as unpatentable under Pfaffle and Primeau, Spiel distinguished its process over the prior art based on the different cooling processes. Spiel stated that in contrast to Pfaffle, in which "[t]he spiral coil is cut after cooling[, i]n the present invention, . . . *the spiral coil is cut into segments prior to cooling*." '426 Amendment [Def. Ex. I] [#67-10] at 12 (emphasis added). Spiel analogized the process in Primeau, which uses a fan "to promote the cooling," to that of Pfaffle, arguing that the use of "ambient air with natural convection is not suitable in Primeau," which requires "[m]ore rapid heat dissipation as by forced convection (i.e. a fan) or refrigeration." Id. at 12-13. Spiel thereby concluded that the prior art did not teach cutting hot coils. See id. at 14 ("A new independent claim has been added emphasizing the feature of cutting the coil into segments *before cooling and providing for cooling of the segments* on [the] conveyor . . . . *The cutting of the hot coil into segments prior to cooling is not found in the art of record*, as already noted.") (emphasis added).

---

[22]  The abstract, which appears at the outset of the patent and summarizes the invention, is considered to be part of the specification. See, e.g., Pandrol USA, LP v. Airboss Ry. Prods., Inc., 320 F.3d 1354, 1363 & n.1 (Fed. Cir. 2003).

Furthermore, in the Notice of Allowance, the patent examiner stated that Spiel's claim as amended was allowable subject matter because no prior art taught an inline system comprised of a coil forming machine "for heating, forming and cutting discrete segments of hot binding coils at a first higher temperature," and that Pfaffle and Primeau do not "anticipate or render obvious applicant's invention" since neither involved "cutting the hot coils into discrete segments and cooling through the use of ambient air." See Notice of Allowance and Fee(s) Due ("Notice of Allowance") [Def. Ex. J] [#67-11], at 6-7 (emphasis in original). Based on the prosecution history and other intrinsic evidence, the Special Master correctly concluded that "Spiel made it clear that 'hot coils' were coils that had been formed but not yet cooled." Report [#83-1] at 13.

Spiel further contends that some form of cooling – generally through the use of a small fan – always takes place within coil forming machines in order to set the helical shape of the coils. See Pl. Markman Br. [#68] at 14-15 ("[T]he device in question is simply a fan that has been known in the art for decades and used in all forming machines to bring the temperature of [the] coil down *somewhat* from its highest temperature prior to the coil's exit from the forming machine, at which point it is *still* too hot for immediate binding. Everyone in the industry knows this.") (emphasis in original). However, whatever the nature of conventional forming machines, the fact remains that Spiel's construction of the claim language is not supported by the intrinsic evidence, which describes drawbacks in the prior art and Spiel's solutions to those problems. Indeed, in its '426 Amendment, Spiel expressly distinguished Primeau's cooling via "forced convection (i.e. a fan)," which Spiel asserted resulted in increased brittleness of the

24

coils.  See '426 Amendment [Def. Ex. I] [#67-10] at 13.  In addition, the Notice of Allowance

indicates that patentability was based, at least in part, on the assumption that no cooling takes

place inside the forming machine.  See Notice of Allowance [Def. Ex. J] [#67-11] at 6-7; see

also Report [#83-1] at 15.  Furthermore, in requesting *ex parte* reexamination of both Patents

after initiating this lawsuit, Spiel again disclaimed the use of a fan.  See Request for

Reexamination [of Patent No. 6,547,502, dated June 25, 2004] [Def. Ex. M] [#67-14] at 6

("Through experimentation, Mr. Spiel discovered that if ambient air cooling was employed *in*

*place of* vortex or chilled air cooling, that the aforementioned brittleness cannot occur.")

(emphasis added); Request for Reexamination [of Patent No. 6,726,426, dated June 15, 2004]

[Def. Ex. N] [#67-15] at 6 (same quotation with respect to the '426 Patent).  Not surprisingly,

the specification makes no mention of a fan, or any other cooling device, within the forming

machine.

     Spiel argues unpersuasively that that omission is of no consequence because "[t]he Spiel

patents do not require usage of any particular forming machine."  See Pl. Markman Br. [#68]

at 15.  Gateway rightly responds that the intrinsic evidence contradicts this assertion.  See

Gateway Resp. Claim Mem. [#70] at 13-14.  As discussed *supra*, Spiel expressly distinguished

its system from those described in the Pfaffle and Primeau patents.  Although Spiel asserts in

this lawsuit that "[a] detailed description of the [pre-existing machines] was unnecessary," Pl.

Markman Br. [#68] at 15, it nevertheless included detailed illustrations and descriptions of

forming machines in the Patents, both of which conspicuously lack any sort of cooling

mechanism.  See '426 Patent col.12 ll.28-39, figs.22 & 24; see also Report [#83-1] at 16

("[T]he level of detail of the forming machine set forth in the Spiel patents . . . would certainly have admitted the simple reference to a cooling fan, particularly since the invention was directed to solving prior art problems associated with the cooling of coils."); Tr. [#83-2] at 103:15-104:7.

In its objection brief, Spiel now argues that "when the plastic is within the forming machine, it is in the form of a continuous thread of filament attached to a large spool outside of the machine," whereas the coils *qua* coils do not appear until after leaving the forming machine. Pl. Obj. [#85] at 7-8. According to Spiel's latest theory, no coils exist within the forming machine, and furthermore, given that the guillotine cutter resides at the exterior of the forming machine, even if the as-yet-uncut plastic thread could be defined as a singular coil, it could not conceivably constitute multiple "coils." See id. at 7-8.

The claims and specification refute this new assertion. The claim language in both Patents assumes that "hot binding coils" come into existence early in the formation process, prior to their departure from the forming machine. See '426 Patent col.14 ll.25-27 (claiming "a coil forming machine for heating, forming *and* cutting discrete segments of hot binding coils") (emphasis added); '502 Patent col.14 ll.14-15 (claiming "a coil forming machine forming hot binding coils"). In addition, the specification states that in "a typical forming machine," after the machine heats the plastic thread and winds it on a mandrel, it "emerges in free air *as a hot spiral coil*." '426 Patent col.12 ll.63-66 (emphasis added). The coil then "passes through a guillotine cutter which cuts it to size," at which point it emerges from the cutter. Id. col.12 ll.66-67 & col.13 ll.1-2. On the face of the Patents, then, it is clear that,

26

contrary to Spiel's contentions, the coils come into existence within the forming machine, before they pass through the guillotine cutter.[23]

### ii.    Review of Extrinsic Evidence

Spiel urges the Court to consider its extrinsic evidence, which, it asserts, establishes that "everyone in the industry knows that fans are used in all forming machines." Pl. Obj. [#85] at 8-9. However, the evidence on which Spiel relies is conclusory at best, if not inconclusive.[24] Furthermore, even if the Court were to consider the testimony and report on which Spiel relies, this weak evidence does not supplant the clear intrinsic evidence, which belies Spiel's contention that some sort of cooling always takes place within the forming machine.

## C.    "First Higher Temperatures"

In its initial *Markman* brief, Spiel argued that "[a]ny rational[] approach to the Spiel patents dictates that 'first higher temperature' . . . relates to the temperature of the coil when it

---

[23] Even if extrinsic evidence is considered, dictionary definitions support the view that the winding of the plastic thread around the mandrel creates a coil or coils. See Webster's 223 (defining "coil" as "a series of loops [or] spiral" or "a single loop of such a coil").

[24] See Transcript of Deposition of Pierre Primeau, dated January 13, 2005 [Pl. Ex. J] [#68-11], at 172:5-21 ("A: Every machine has a blower.  Q: So without a blower, the coil will be unusable? A: Well, the quality will not be there. . . . I think it's not possible.  Never tried it. But every machine has it. . . .  So I cannot figure out how you can form a coil without blower. . . . Q: So you don't have any proof that without the blower it's an uninsertable [c]oil?  A: I can call you tomorrow with the proof.  But I haven't tried it right now."); Rebuttal Report by Walter D. Klassen [Pl. Obj. Ex. H] [#85-9] at 3 ("[P]rior art forming machines . . . that are used for coil production all use fan/blower cooling to cool the coil prior to cutting the coil to length.  Any coil that is produced using this type of equipment could not reasonably be described as hot upon its discharge from the forming machine.").

leaves the forming machine and begins travel on the patented cooling conveyor." Pl. Markman Br. [#68] at 13. Gateway, in contrast, proposed that "first higher temperature" be construed, in accordance with its proposed construction of "hot binding coils," to mean "a temperature exceeding 190° F," as the temperature for forming plastic coil typically exceeds that figure. See Gateway Claim Mem. [#66] at 20.

Because of the different usage of the term in the two Patents, the Special Master recommended that "first higher temperature" be construed, for the '426 Patent, as "the temperature at which the hot binding coils are formed," and, for the '502 Patent, as "the temperature at which the hot binding coils are formed and cut." See Report [#83-1] at 16. He based this distinction on "the ordinary meaning of the words of the claims," which differ slightly in the two Patents. See id.; compare '502 Patent col.14 ll.14-15 (claiming "a coil forming machine forming hot binding coils at a first higher temperature"), with '426 Patent col.14 ll.25-27 (claiming "a coil forming machine for heating, forming *and cutting* discrete segments of hot binding coils at a first higher temperature") (emphasis added); see also ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

Acknowledging that the language in the two Patents is slightly different, Spiel nonetheless argues, without support, that the phrase should be treated the same way for both Patents. See Pl. Obj. [#85] at 10. The crux of Spiel's objection is that both passages clearly indicate the inventor's intent to "us[e] the phrase 'first higher temperature' to describe the coils

as they are cut from the forming machine and begin their time on the patented cooling conveyor." Id. at 11.

Spiel rightly notes that the '502 Patent's specification reflects that the coils are still hot when cut to size. See '502 Patent col.12 ll.65-67 ("[S]till-hot plastic spiral coils are cut to the length required [by the guillotine cutter]."). Nevertheless, it does not follow that the term "first higher temperature," as used in that Patent, refers exclusively to the point of cutting and not to the point of formation. Indeed, that Spiel made a more detailed claim in the subsequent '426 Patent – claiming "a coil forming machine for heating, forming and cutting discrete segments of hot binding coils at a first higher temperature," '426 Patent col.14 ll.25-27 – indicates its awareness of this distinction.[25] Because Spiel has neither presented any intrinsic evidence that this term carries the same meaning in both Patents, nor cited any relevant case law, its objection to the Special Master's two constructions is without merit.

D.     "Ambient Air"

In its initial *Markman* brief, Gateway proposed that "ambient air" be construed to mean "non-moving air within a room." Gateway Claim Mem. [#66] at 11. Spiel opposed this construction, arguing that Gateway failed to support its association of "ambient air" with the absence of movement. Pl. Rebuttal [#69] at 5. According to Spiel, "'ambient' simply describes the surrounding environment." Id.

---

[25] In an Amendment filed with the USPTO, Spiel explained why it had modified that claim language. See '426 Amendment [Def. Ex. I] [#67-10] at 13 ("Claim 1 has been amended to be more specific about the 'discrete' hot binding coils, by reciting that the coil forming machine heats, forms and cuts discrete segments of hot binding coils, the segments being of a length required for the book being bound.").

At the *Markman* hearing, both parties concurred with the Special Master's proposed construction of "ambient air" to mean "surrounding air that has not been modified as by forced convection, a compressor or a refrigerant." Tr. [#83-2] at 87:5-89:15. After re-examining the specification and prosecution history, the Special Master ultimately recommended a construction with slightly different language: "surrounding air that has not been modified, as by a compressor, refrigerant, or a fan." Report [#83-1] at 18-19. Spiel objects to this formulation, specifically, "the improper inclusion of the word 'fan.'" Pl. Obj. [#85] at 11.

Both Patents claim a means for carrying the hot binding coils from the forming machine to the binding machine "under conditions in ambient air, said carrying means providing sufficient duration of travel time to provide enough slow cooling time in said ambient air to bring the temperature of said binding coils down to close to room temperature and a solid, non-brittle state." See '426 Patent col.14 ll.33-37. As used in the claims, the term "ambient air" appears on its face to refer to surrounding air that has not been subjected to any sort of modification.

The specification, which similarly describes the conveyance of the coils from one machine to the other, supports this construction. It explains that the conveyor takes "some time" to advance, in that it moves forward "intermittently" each time "a segment of coil is cut," causing "a coil in the midsection [to] be significantly cooler by action of ambient air." Id. col.13 ll.11-14. While the diagram of the cooling conveyor "shows the movement of coils . . . at ambient air temperature," the specification indicates that "other cooling methods known to those skilled in the art may be used to cool coils while coils advance toward receiving

30

conveyor, *such as* by exposure of the coils to pressurized blasts of compressed air, by exposure [of] coils to conventional cooling chambers cooled by freon filled conduits or othe[r] refrigeration means." Id. col.13 ll.22-29 (emphasis added). This language in the specification thus indicates that the term "ambient air" was not meant to encompass *any* other cooling process, including, but not limited to, the enumerated methods. The specification thereby supports the Special Master's recommendation that "ambient air" be construed as referring to the unmodified surrounding air in the room, as opposed to air that has been changed in some way, including by the use of a fan, to cool the coils on the conveyor.

The prosecution history similarly distinguishes "ambient air" from prior art that made use of various cooling mechanisms. In May 2003, before the first Patent was granted, Spiel explained to the USPTO that in Pfaffle, "the hot plastic spiral coils are not cooled at ambient air temperature while progressively moving over a conveyor . . . [but rather] are cooled by a Vortec cooler with a blast of cold air under rapid cooling." See Declaration [Def. Ex. G] [#67-8] at 8. In the same submission, Spiel also distinguished Primeau, stating that it did not teach cooling under ambient air temperatures, but rather by "insert[ing the coil] in a closed sleeve, to which is applied cool air from a cooling device." Id. at 10; see also '426 Amendment [Def. Ex. I] [#67-10] at 13 (distinguishing the Spiel invention as using "ambient air with natural convection," because "forced cooling" increases brittleness); Request for Reexamination [Def. Ex. M] [#67-14], at 6 ("Through experimentation, Mr. Spiel discovered that if ambient air cooling was employed in place of vortex or chilled air cooling, that the aforementioned brittleness cannot occur.").

Spiel now argues that what it "intended to disclaim from all prior art was refrigerants and artificial cooling systems," and further that it considered Primeau's cooling process to be "closer to" Pfaffle's than the one described in its Patents.  See Pl. Obj. [#85] at 10.[26] However, its subjective intent is of little or no value in determining the scope of a claim.  See Markman, 52 F.3d at 985.  In any event, Primeau does not indicate that it requires such an artificial cooling system.  The Primeau specification mentions only "[a] cooling device [that] continuously cools" the outer sleeve containing the heated plastic coil.  See Primeau [Def. Ex. L] [#67-13] col.4 ll.31-32; see also id. fig.1 (illustration of fan for cooling outer sleeve). Admittedly, Primeau and Spiel do teach different cooling processes: in the former, the coils are cooled while encased within a stationary sleeve, see id. col.6 ll.54-67 & col.7 ll.1-13, whereas the Spiel Patents teach cooling coils exposed to the open air, see '426 Patent col.14 ll.23-37. Nevertheless, in amending its Patent application, Spiel distinguished Primeau based not on the enclosing apparatus but based on Primeau's use of "forced convection," as opposed to "ambient air with natural convection."  See '426 Amendment [Def. Ex. I] [#67-10] at 13.[27]  In the present context, as confirmed by the language of the '426 Amendment, "forced convection" reasonably can only be read to refer to cooling that takes place through an

---

[26]  For the reasons discussed below, this argument is unavailing even assuming *arguendo* that "artificial cooling systems" refers to refrigeration-type cooling systems and does not encompass fans.

[27]  Webster's Dictionary defines "convection" as "the transfer of heat by . . . the action or process of conveying."  Webster's at 253; see also Random House Dictionary of the English Language 319 (1966) (defining "convection" as "the transfer of heat by the circulation or movement of the heated parts of a liquid or gas").

artificial mechanism or process.  See id. ("More rapid heat dissipation *as by forced convection (i.e. a fan)* or refrigeration is required in Primeau '156.") (emphasis added).  On the other hand, "natural convection" suggests cooling unassisted by an external device, especially when coupled with the words "ambient air."  See also id. (explaining that ambient air "leaves the coils less brittle[, i]n contrast [to] the *forced cooling* of the references") (emphasis added).

Representations by Spiel to the USPTO in the prosecution of the '502 Patent make a similar distinction.  In response to the patent examiner's rejection of some of its original claims as being unpatentable under Pfaffle, Spiel argued that it was not obvious "to substitute ambient cooling . . . [with] the forced cooling of Pfaffle."  See '502 Amendment [Def. Ex. E] [#67-6] at 10-11.  Both Amendments thereby explicitly distinguished Primeau and Pfaffle on the basis of the prior art's reliance on some sort of cooling device (represented in a Primeau diagram as a fan). Accordingly, the Amendments further support the Special Master's construction of "ambient air" as "surrounding air that has not been modified."  Report [#83-1] at 18.

As the intrinsic evidence provides ample support for the Special Master's conclusion,[28] there appears to be no basis for disturbing his construction of this term or any other term.

_____

[28]  The proper construction of "ambient air" can be ascertained without reference to extrinsic evidence.  See Hockerson-Halberstadt, 222 F.3d at 955.  Even so, dictionary definitions provide further support for the Special Master's construction.  See, e.g., OED, *supra* (defining "ambient temperature" as "the temperature of the surrounding environment, esp. as unaltered by direct human intervention") (March 2007 draft addition); Hawley's Condensed Chemical Dictionary 50 (12th ed. 1993) (defining "ambient temperature" as "the temperature of the environment in which an experiment is conducted or in which any physical or chemical event occurs"), cited in Doyle v. Crain Indus., No. 00-1103, 243 F.3d 564 (table), 2000 WL 1608826, at *4 (Fed. Cir. Oct. 25, 2000).

## CONCLUSION

For the foregoing reasons, this Court recommends that the Special Master's Report be adopted in its entirety, over Spiel's objections.

Any objection to the recommendations contained herein must be filed with the Honorable Frederic Block by July 7, 2007. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to docket this Report and Recommendation through the Electronic Case Filing System.

**SO ORDERED**

**Dated:        Brooklyn, New York
            June 21, 2007**

                              **ROANNE L. MANN
                              UNITED STATES MAGISTRATE JUDGE**